UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Jerome Rosen, Paul Rosen, Jay Rosen and
Calvin Sinclair individually and as
beneficiaries of the Rosen Plastering Corp.
Employees Pension Plan, and Jerome Rosen as
Trustee of the Rosen Plastering Corp.
Employee Pension Plan,

              Plaintiffs,             CV-01-2314 (CPS)

   - against -             MEMORANDUM OPINION
                                   AND ORDER
Irwin Rosen, as Trustee of the Rosen
Plastering Corp. Employee Pension Plan,

              Defendant.

----------------------------------------X

SIFTON, Senior Judge.

    Plaintiffs Jerome Rosen, Paul Rosen, Jay Rosen and Calvin

Sinclair bring this action against defendant Irwin Rosen, trustee

of the Rosen Plastering Corporation Employee Pension Plan,

seeking to recover damages from the defendant for breach of

fiduciary duties, pursuant to 29 U.S.C. §1104(a)(1)(A)(I) and 29

§1104(a)(1)(D). The matter was tried before the undersigned

sitting without a jury on November 14, 2005 and November 15,

2005. For the reasons set forth below I conclude that defendant

has not breached his fiduciary duties under 29 U.S.C.

§1104(a)(1)(A)(I) and 29 §1104(a)(1)(D) and that defendant is

entitled to judgment in his favor. What follows sets forth the

findings of fact and conclusions of law on which this decision is

based as required by Rule 52(a) of the Federal Rules of Civil

Procedure.

BACKGROUND

Irwin Rosen and Jerome Rosen are brothers and equal owners of Rosen Plastering Corporation, a New York state corporation engaged in the business of plastering and fire proofing residential and commercial buildings. Tr. 6-7. Irwin and Jerome are also co-trustees of the Rosen Plastering Pension Plan. The only beneficiaries of the plan in question were Calvin Sinclair, Irwin Rosen, Jerome Rosen, and Jerome's two sons, Jay Rosen and Paul Rosen. Tr. 6.

The Pension Plan is governed by two documents: the American General Life Insurance Company of New York Defined Contribution Plan and Trust ("Contribution Plan") and the Money Purchase Adoption Agreement ("Adoption Agreement"). Ex. 1 and 2.

The Contribution Plan defines the Employer as, "the entity specified in the Adoption Agreement" or "any successor which shall maintain this plan." Ex. 2 ¶1.15. The Adoption Plan provides that the Employer here is Rosen Plastering. The Contribution Plan obligates Rosen Plastering to appoint trustees and an administrator and to fund the plan. Ex. 1. ¶2.3. The Contribution Plan permits an Employer to designate itself as Administrator, as Rosen Plastering did. It also controls the trustees decision making process, stating that, "[i]f there shall be more than one Trustee, they shall act by a majority of their

number, but may authorize one or more of them to sign papers on their behalf." Ex. 1. ¶7.1(d).

The Contribution Plan also provides for the termination of the plan or the merger or consolidation of the plan with another plan. Specifically, the Contribution Plan provides as follows:

8.2(b) TERMINATION

(b) Upon the full termination of the Plan the Employer shall direct the distribution of the assets to Participants in a manner which is consistent with and satisfies the provisions of Section 6.5. Distributions to a Participant shall be made in cash (or in property if permitted int the Adoption Agreement) or through the purchase of irrevocable non-transferable deferred commitments from the Insurer. Except as permitted by Regulations, the termination of the Plan shall not result in the reduction of "Section 411(d)(6) protected benefits" as described in section 8.1.

8.3 MERGER

This Plan may be merged or consolidated with, or its assets and/or liabilities may be transferred to any other plan only if the benefits which would be received by a Participant of this Plan, in the event of a termination of the plan immediately after such transfer, merger or consolidation, are at least equal to the benefits the Participant would have received if the Plan had terminated immediately before the transfer, merger or consolidation and such merger or consolidation does not otherwise result in the elimination or reduction of any "Section 411(d)(6) protected benefits" as described in Section 8.1(e).

Although the plan does not define the phrase "full termination" it is undisputed that if the plan has no Employer, the plan must be terminated. Ex. 10, pg. 2.  The Adoption Plan specifies that if the plan is terminated and its assets distributed to the participants then the distributions must be

made in "cash only." Ex. 2, E9(a).

From 1979 to 1998 Irwin had Jerome's authorization under the plan to act on behalf of the Pension Plan, to buy and sell securities for the Pension Plan, to make bank deposits, to deal with the bank accounts and to sign papers for the pension plan. Tr. 190:17-22; 70:2-9; 76:23. Irwin generally bought securities and held them until they matured, then reinvested the money in similar securities. Tr. 27.

In 1996 Irwin discovered that Jerome had formed a new corporation, J. Rosen Plastering, Inc., and that Jerome was diverting corporate opportunities to his new business. In August 1996 Irwin filed a petition in the Supreme Court of the State of New York to dissolve Rosen Plastering. Pl. Ex. 14. The dissolution was ordered and the court directed a receiver, Douglas Rosenberg, to take control of the Pension Plan's liquid assets, totaling $224,955.58. Tr. 139.

Irwin testified credibly that he believed, based on the plan documents, that the dissolution of Rosen Plastering required termination of the plan and distribution of its assets. Irwin also understood that he "could not give a security to one individual and another security to another. . . the securities had to be liquidated and to [sic] be paid in cash." Tr. 30:21-32:1.

Irwin testified that Fred Pierson, a plan analyst at

Securities Administrators, a pension administration company hired

by Rosen Plastering, told him that if the plan was terminated it

would have to liquidate the securities and distribute cash.  Tr.

36; Ex. 5. In an affidavit admitted by stipulation at trial Fred

Pierson stated that Securities Administrators performed only

administrative functions for Rosen Plastering (such as preparing

annual statements indicating the value of pension benefits for

each participant and preparing tax forms for the Pension Plan),

but did not advise the trustees on any matters relating to the

Pension Plan. Pierson Aff. ¶¶ 3, 8.  However, Pierson's statement

is contradicted by his statement in the same affidavit that he

advised Jerome Rosen that the Pension Plan could either be

terminated or could be continued under the auspices of J. Rosen

Plastering. In any event, regardless of whether Irwin received

advice from Pierson or not, I credit Irwin's testimony that both

he and Jerome believed that the Pension Plan had to be liquidated

because Rosen Plastering had been dissolved.

By letter dated June 29, 1998, Irwin wrote to Jerome

addressing the question of what to do with the Pension Plan. Ex.

5. The letter presumes that the Pension Plan must be wound up.

The letter goes on to state in relevant part as follows:

> I was advised by Security Administrators, Inc. that we
> could not distribute the actual securities held by the
> trust to participants, and based upon the interest
> rates today, it would not be beneficial to do this
> anyway. In order to pay to each participant of the
> pension fund their appropriate shares of the total, all

securities will have to be sold. As interest rates are
the lowest that they have been in some thirty years, we
have greatly benefitted by the price appreciation in
the bonds and the high values that we can obtain for
the entire portfolio of securities. No portion of the
portfolio is subject to any penalties for selling the
securities at this time.

Irwin closes by asking Jerome to agree to sell the securities

immediately and states that Jerome should indicate his "agreement

or disagreement" by faxing back his answer. Id. On the same day,

Irwin also sent Jerome a letter for Jerome's signature directing

Douglas Rosenberg to return the liquid assets of the Pension Plan

to Irwin. Ex. I. Jerome did not sign it. Id.

By letter dated July 1, 1998 Jerome responded, via his

attorney, to Irwin's request. Ex. J. The letter stated:

As regards the pension plan securities and the
proposals made by your client, please be advised that
Jerry is amenable to depositing all of the pension plan
securities into an account and selling same so long as
the proceeds of the sale are maintained in a cash
management account until the final distribution
contemplated by the Stipulation can be accomplished.

Ex. J. Irwin testified credibly at trial that he interpreted

Jerome's response to indicate that Jerome consented to the

liquidation of the securities. Jerome testified that his lawyer's

statement that he was "amenable" to liquidation was only an

indication that Jerome was willing to discuss liquidation, but

was not permission for Irwin to liquidate. Jerome testified that

he believed that they would first discuss, "what had to be done

to liquidate, what return we will get on the money, who – what we

would do with the money." Tr. 127:5-6. I do not find Jerome's testimony credible. It is not consistent with his letter with states that he is amenable "so long as" the proceeds are placed into a cash management account. This conditional statement implies consent to the liquidation so long as his one condition is met and does not imply that Jerome required further discussion before he would consent. Moreover, Jerome's proposed interpretation of the letter is inconsistent with a subsequent letter, discussed further below, in which Jerome demanded that the liquidation cease because he claimed, his "initial amenability to the liquidation was based upon the misleading information" provided by Irwin. Ex. DD.

Based on Jerome's consent, Irwin began liquidating the securities. The securities being sold were placed in a Prudential Securities Account ("Prudential Account") and were liquidated by Michael Silver, a financial consultant and stock and bond broker at Prudential Securities.

At trial the Prudential Account monthly reports from June 1998 to August 2002 were admitted. Ex. 3. These reports were addressed to Irwin Rosen as trustee of Rosen Plastering Corporation at his home address. Id. The reports were also mailed to the office of Rosen Plastering. At trial, Jerome testified that he did not receive a signature card for the Prudential Account until after Irwin had received his pro rata share of the

Pension Plan assets in cash.

Jerome testified that at the end of July he became aware that Irwin had opened the Prudential Account and was liquidating the securities. According to Jerome he called Michael Silver, and said, "I don't know what's going on here. I'm a trustee and I don't authorize any of this." Tr. 128:17-18. While Jerome testified that he anticipated that Silver would call Irwin and would stop selling the securities, Jerome did not specifically instruct Silver to cease the liquidation. Id: 21-22. Shortly thereafter Irwin spoke to Silver about Silver's conversation with Jerome which Irwin interpreted as asking Silver to cease the liquidation of securities.

By letter dated July 28, 1998 Irwin wrote to Jerome asking Jerome why he told Silver to stop liquidating securities. Ex. 6. Irwin explained that he was concerned about Jerome's change of heart because:

> Once I received the letter from Mr. Nigro [Jerome's attorney], I immediately began to deposit the pension securities in a brokerage account and began to sell the securities and have the proceeds deposited into a cash management account.

Ex. 6. Irwin testified that almost immediately after sending this letter he spoke to Silver again and Silver said that Irwin had misunderstood their earlier conversation and that Jerome had not told Silver to stop selling securities. Irwin's testimony is supported by an affidavit from Silver stating that he did not

know why Irwin sent the July 28 letter to Jerome and that Jerome

never instructed Michael Silver to suspend the sale of any

securities owned by the Pension Plan. Silver Aff. ¶1-3.

By letter dated August 18, 1998 Jerome's counsel informed

Irwin's counsel, in relevant part, as follows:

> In addition to the following, please be advised that
> Jerry has been told that there is no need to terminate
> the pension plan[1] contrary to Irwin's letter of June
> 29, 1998. In view of the foregoing, Jerry demands that
> all trading cease and that no further trading take
> place as of the close of business today.
>
> If Irwin wants to receive his benefits he can make such
> application to the plan as is necessary in order to do
> so. This will require that he resign as trustee of the
> plan, surrender the securities and the securities
> accounts to Jerry. Irwin will then receive his benefits
> in accordance with the plan.
>
> As Jerry does not now believe that the liquidation of
> the plan is in the best interests of the plan
> beneficiaries, this is the only route open to us.
> Indeed, Jerry's initial amenability to the liquidation
> was based upon the misleading information supplied in
> Irwin's June 29, 1998 letter.

Ex. DD.

Upon receipt of the August 18 letter Irwin instructed Silver

immediately to cease liquidating the securities. Tr. 94. Although

one security was accidentally sold after the August 18 letter,

Irwin immediately repurchased it. Id.

By letter dated August 26, 1998, Irwin wrote to Fred Pierson

requesting that he be terminated as an employee of the Rosen

---

[1] The letter does not indicate who told Jerome that there was no need to
liquidate the securities.

Plastering Pension Plan, that he be paid the money owed to him by the pension plan, and that the pension plan continue to exist. Ex. 9

By letter dated September 1, 1998 Fred Pierson told Jerome that the Pension Plan did not need to be terminated if Jerome elected to continue the Pension Plan under the sponsorship of J. Rosen Plastering. Pierson Aff. ¶11-12. Fred Pierson instructed Jerome that "the decision to continue is yours to make." Id. ¶14. However, Jerome never responded to Fred Pierson indicating whether J. Rosen Plastering wished to be the successor employer for the Pension Plan. Id. ¶15. Jerome testified at trial that J. Rosen Plastering never took over the Pension Plan. Tr. 201.


DISCUSSION

Defendant's Breach Under 29 U.S.C. §1104(a)(1)(A)(I)

29 U.S.C. §1104(a)(1)(A)(I) provides that, "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries." "This statutory duty of loyalty has been described by [the Second Circuit] as requiring that a fiduciary act, in Judge Friendly's felicitous phrase, with an 'eye single to the interests of the participants and beneficiaries.'" *State Street Bank and Trust Co. v. Salovaara,* 326 F.3d 130, 136-137 (2d

Cir. 2003)(quoting *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d
Cir. 1982). However, "a trustee does not violate his fiduciary
duty 'simply because [a decision] incidentally benefits,' either
a party in interest or the trustee himself." *New York State
Teamsters Council Health and Hosp. Fund v. Estate of DePerno,* 816
F.Supp. 138, 145 (N.D.N.Y. 1993)(quoting *Donavan*, 680 F.2d at
271).

Jerome's theory is that Irwin should have taken the $487,995
to which he was entitled upon his retirement from the liquid
assets of the Plan held by the Receiver. But in fact, Irwin
attempted to do so only to be confronted with Jerome's refusal to
consent to the release of the funds. When Irwin then sought
Jerome's consent to the liquidation of the Fund's securities to
fund his withdrawal of his pension money Jerome gave his consent.
However, he claims that he gave his consent only because Irwin
misrepresented to him that the Plan had to terminate because of
the dissolution of the corporation. No such misrepresentation
appears in the record of the trial. But in all events the terms
of the Plan which provided for the alternative of a successor
"Employer" were as available to Jerome as they were to Irwin.

Irwin testified convincingly that he believed that because
Rosen Plastering was dissolved the Pension Plan was terminated
and had to be liquidated in order to be distributed. Jerome
claims that the Pension Plan did not have to be terminated

because it could have been continued under the auspices of J.
Rosen Plastering. The plan documents do allow the plan to
continued under the auspices of a new employer. However, there is
no evidence that Jerome indicated at any point that J. Rosen
Plastering was willing to assume the responsibility of managing
the Pension Plan. Indeed, even after explicitly offered the
opportunity to take over the plan, J. Rosen Plastering did not
opt to do so. Moreover, in order to transfer the Pension Plan the
trustees would have had to be assured that the rights and
benefits under the old Pension Plan would not be diminished under
the new plan. Ex. 1, ¶8.3. Since J. Rosen Plastering had never
proposed to take over the plan and accordingly had never
explained the terms under which it would take over the plan,
Irwin had no ability to ascertain whether or not a transfer under
¶8.3 of the Contribution Plan was appropriate. Since Irwin had no
indication that there was a possible willing successor employer
he was correct that the plan had to be terminated and liquidated,
and his statements to that effect were not misrepresentations.

Jerome also points to Irwin's August 26, 1998 letter
requesting that he be terminated from the Rosen Plastering
Pension Plan and receive his benefits, but not requesting that
any other participant receive his benefits, as evidence that
Irwin was not acting solely in the interest of the plan
beneficiaries when he chose to liquidate the plan. Ex. 9.

However, Irwin's August 26 letter was written after Jerome had
indicated that he no longer consented to the liquidation because
the Pension Plan could be continued under the auspices of J.
Rosen Plastering. Accordingly, Irwin's letter is best read as a
concession to Jerome's request that the Pension Plan not be
terminated. If the Pension Plan was to continue under J. Rosen
Plastering, then Irwin, who was not an employee of J. Rosen
Plastering, wished to retire and collect the benefits due to him.
The fact that in light of the continuation of the plan Irwin
chose to collect his benefits without attempting to collect the
benefits of the other beneficiaries is no evidence that at an
earlier date, prior to any indication that any employer would
assume the Pension Plan, Irwin's choice to liquidate the plan was
not solely in the interest of the plan beneficiaries.

Finally, Jerome points to Irwin's answer at trial when asked
whether after receiving Pierson's September 1 letter indicating
that the plan could continue under the auspices of J. Rosen
Plastering, he reconsidered whether the only option for the plan
was liquidation. Irwin responded:

> No. I didn't make anything about that because he knew I
> wanted mine out and whatever the letter says that he
> could continue, it was up to Jerry and the other – you
> know, Jerry as trustee to continue or get out or
> liquidate it also.

Tr. 59:6-13. However, this statement is revealing of Irwin's
intent when liquidating the Pension Plan in June, July and

August, because this statement, like Irwin's statement in the August 28 letter, reflects Irwin's attitude only after Jerome withdrew his consent for the liquidation and indicated that he might wish to continue to continue the plan under the auspices of J. Rosen Plastering. Thus, Irwin's trial testimony indicates only that *after* Jerome indicated that he would continue the Pension Plan, Irwin no longer cared whether liquidation was the only option for the plan, because he knew that whether the plan was liquidated or was continued under J. Rosen Plastering he was entitled to collect his share of the plan. The decision to complete the liquidation or to continue the plan under J. Rosen plastering did not involve Irwin but would be up to Jerome.

Defendant's Breach Under 29 U.S.C. §1104(a)(1)(D)

29 U.S.C. §1104(a)(1)(D) provides that, "a fiduciary shall discharge his duties with respect to a plan solely . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter."

Jerome alleges that Irwin did not discharge his duties in accordance with the documents governing the Pension Plan because he acted unilaterally, without the agreement of the majority of trustees, as required by ¶7.1(d) of the Contribution Plan. Specifically, Jerome alleges that Irwin opened a Prudential

Account in the name of the Pension Plan without the participation, signature or knowledge of Jerome, began liquidating the Pension Plan without Jerome's consent and continued the liquidation even after Irwin was aware that Jerome objected to the liquidation.

The Liquidation

Jerome argues that Irwin initiated a liquidation of the Pension Plan securities without his consent. As discussed above, Jerome's July 1, 1998 letter stating that he was amenable to the liquidation constituted Jerome's consent to the plan. Jerome argues however, that he consented only because Irwin misrepresented the fact that Securities Administrators told Irwin that the Pension Plan had to be liquidated. Jerome claims that if he had known the Pension Plan could have been continued, he would not have consented to the liquidation.

However, Irwin's June 29, 1998 letter demonstrates that the letter does not state that Securities Administrators told Irwin that the plan had to terminate or that the recipients had to be paid. Rather, according to Irwin, Securities Administrators advised only that if participants were paid they had to be paid in cash, not in securities. It is undisputed that the plan requires that payments to beneficiaries must be in cash, not in securities Ex. 2, ¶E9A. Thus, Irwin's statement that payments had to be in cash was not a misrepresentation.

Irwin's letter does implicitly assume that the plan must be terminated. Without that assumption, his opening statement that actual securities could not be distributed to participants would be nonsensical since there is no indication from the letter itself that there is any reason for securities to be distributed. Moreover, the fact that Jerome's response to Irwin's letter does not question why any distribution should be made (whether in cash or in securities) implies that Jerome was operating on the same assumption as Irwin, namely that the plan had to be dissolved. There is no evidence that this assumption by Jerome was based on any misrepresentation by Irwin. Presumably, Jerome's assumption derived from the same source as Irwin's, namely the plan documents, which require that in the absence of an employer the Pension Plan be terminated.

The Continued Liquidation

Jerome argues that even if Irwin operated with Jerome's consent when he began to liquidate the Pension Plan, that after Jerome's conversation with Michael Silver in July 1998, Irwin was aware that Jerome had withdrawn his consent, and that accordingly, any securities liquidated after this point were liquidated without Jerome's consent.

According to Jerome, after discovering that Irwin was liquidating securities Jerome called Michael Silver and told him,

"I don't know what's going on here. I'm a trustee and I don't authorize any of this." Tr. 128:17-18. Jerome does not claim that he instructed Silver to cease the liquidation. Thereafter Michael Silver had a conversation with Irwin. The evidence at trial did not establish what this conversation entailed. Irwin testified that immediately after the conversation his impression was that Jerome had told Michael Silver that Jerome no longer wished to liquidate the Pension Plan. Michael Silver did not testify. His affidavit states only that he does not know why Irwin believed Jerome wished to cease the liquidation and that Jerome never told Michael to suspend or stop the liquidation. Irwin testified that only a few days after the initial conversation he spoke to Michael Silver again and that Silver explained that Irwin had misunderstood their first conversation and that Jerome had never expressed a wish to cease the liquidation. Because plaintiff did not present any evidence of the content of Michel Silver and Irwin's first conversation it is impossible to determine what Michael Silver said to Irwin that made Irwin believe that Jerome wished to liquidate. As a result, it is also impossible to determine whether it was reasonable for Irwin to accept Michael Silver's subsequent explanation that Jerome did not ask Silver to cease the liquidation. On the facts in evidence there does not appear to be any reason why Michael Silver would have wanted the liquidation to continue and accordingly, no reason for Michael

Silver to tell Irwin that Jerome continued to consent to the liquidation unless Jerome did in fact consent. In any event, both Silver and Irwin contend that Silver told Irwin that Jerome did not want to cease the liquidation. Plaintiffs, whose burden it is to prove their case, have offered no evidence suggesting that Silver did not so inform Irwin, that Irwin should have disbelieved Silver, or that Irwin should have investigated further. *Silverman v. Mutual Life Ins. Co.*, 138 F.3d 98, 103 (2d Cir. 1998)(where fiduciary has "no reason to be suspicious" of a statement the fiduciary has "no duty of inquiry"). Accordingly, when Irwin continued the liquidation after his conversation with Michael Silver, he did so with Jerome's continued consent.

The Prudential Account

Jerome claims that Irwin unilaterally opened the Prudential Account without Jerome's permission[2] and that Irwin intentionally hid the account from Jerome. However, Jerome specifically consented to having the securities placed into an account in his

---

[2] At trial Irwin testified that he believed the Prudential Account was opened in 1996. When plaintiff's counsel asked Irwin if he remembered stating during a pre-trial deposition that he opened the account in 1998 Irwin responded that he didn't remember. Tr. 39-40. Jerome points to two documents in further support of the fact that the account was opened in June of 1998. First, Jerome points out that the Prudential Account records in evidence at trial date only to June 1998. However, the mere fact that earlier bank records were not admitted does not prove that no earlier bank records exist. Jerome did not submit any records from the bank indicating the date on which the account was opened, nor did he offer any testimony from a bank employee to that effect. However, I need not determine whether the account was opened in 1996 or in 1998 because even assuming that Jerome is correct and that the account was opened in 1998, Jerome has not shown that Irwin's action in opening the account was without Jerome's permission.

July 1, 1998 letter in which he stated that "Jerry is amenable to depositing all of the Pension Plan securities *into an account* and selling same." (emphasis added). In doing so Jerome implicitly granted Irwin permission to take those steps necessary to effectuate the agreed upon plan of action. Since depositing securities into an account presupposes the existence of the account, Jerome implicitly granted Irwin authority to open the Prudential account.

Jerome argues that the unilateral nature of Irwin's actions is demonstrated by his attempts to hide the existence of the account from Jerome. However, any accusation that Irwin attempted to hide the existence of the account is belied by the fact that Irwin's July 28, 1998 letter to Jerome letter explicitly states that he deposited the securities into a brokerage account.

Jerome argues further that Irwin's intent to hide the account can be inferred from the fact that the monthly Prudential Account reports are addressed to Irwin at his home address and that Jerome did not receive a signature card until after Irwin had removed his money from the Pension Plan. However, the evidence at trial demonstrated that although both Irwin and Jerome were trustees, Irwin, with the consent of Jerome, was the one actually managing the Pension Plan. As discussed above, Jerome specifically consented to the liquidation of the plan, and by extension, to the opening of the Prudential account and the

depositing of the securities in a brokerage account so that they could be liquidated. Thus, the fact that Irwin put his name on the account and had the reports mailed to his home does not indicate that he was attempting to hide the account from Jerome, especially since by 1998 Rosen Plastering was out of business and Irwin would have had little reason to come into the office on a regular basis. Ex. II. Rather, it indicates a practical decision by Irwin to make it easier for himself to receive the reports since it was he who was actually overseeing the liquidation. Moreover, despite the fact that Jerome claims Irwin was attempting to hide the account, account reports continued to arrive at the Rosen Plastering Office at least through the end of July.

Jerome also claims that the fact that he did not receive a signature card to make him a signatory on the account indicates that Irwin was attempting to hide the account from him. Jerome offered no documentary or testimonial evidence from Prudential or any other source, to the effect that Irwin instructed Prudential not to make Jerome a signatory or to send Jerome a signatory card at the time Irwin opened the account or that Irwin instructed Prudential to send Jerome a signature card at some later date. Indeed, the signature card is titled "Client's Opening Cash Agreement" which suggests that it was sent upon the opening of the account, and not at some later date. Ex. 9. It is unclear why

Jerome experienced a delay in receiving the signature card but Jerome presented no evidence to suggest that Irwin was responsible for the delay. Accordingly, Jerome's assertion that Irwin prevented him from receiving the card is mere speculation and it is just as likely that Prudential simply took time to process the card.

## CONCLUSION

For the reasons set forth above I find that defendant did not violate his fiduciary duties under  29 U.S.C. §1104(a)(1)(A)(I) and 29 §1104(a)(1)(D).

The Clerk is directed to enter judgement dismissing the complaint and to transmit a filed copy of the within to the parties and the Magistrate Judge.

Dated :   Brooklyn, New York

        July 11, 2006

                   By: /s/ Charles P. Sifton (electronically signed)
                       United States District Judge